Tapley v. Chambers May it please the court. My name is Jonathan Kaizak. I represent the plaintiff appellants Eric Tapley, William Jose and Clifford Pugh. This case involves claims that Eric Tapley brought against the defendant appellees. The claim of illegal seizure and malicious prosecution are Illinois state law as was Mr. Jose and Mr. Pugh's claims of illegal seizure and illegal search. Now the issues in this case involve the jurisdictional aspect of course of whether Mr. Jose and Mr. Pugh are proper parties to the appeal and whether Mr. Tapley's claim of malicious prosecution is properly before this court. There's also the issues of whether probable cause existed for the initial stop of Mr. Tapley and the arrest of Mr. Tapley for obstruction under Illinois law and then the issue of whether reasonable suspicion and probable cause existed for the seizure and search of Mr. Jose and Mr. Pugh. I want to go into the jurisdictional aspect first as that issue will determine what claims will actually be on the record and that will require a little bit of history as the procedure and the filings in this case. All the claims were originally filed. The big problem here is Jose and Pugh should have filed an appeal in case one when Tapley refiled his unlawful seizure claim and so I don't see how you can resurrect those claims now that should have been raised in case one. That's the bottom line. We understand the procedural history of the case. Right. Well Judge, the rule 41 which is the judgment that was entered into in the first case states that an action that's dismissed without prejudice can be refiled which is exactly as the judgment in the original first case as you mentioned, the Johnson case, stated. But didn't the district court really terminate the case? I know it was in an interlocutory order but didn't that end it? No it did not Judge because we did try to have a first appeal to the Seventh Circuit within 30 days of that order and the Seventh Circuit issued an order saying that it appeared that it did not have jurisdiction based on a final order at that time and upon reviewing the case law at that time we determined that that was the case and we dismissed our first appeal. So at that point upon refiling Mr. Tapley's claim we believe under rule 41 which the judgment referred to in the first case, rule 41 would have allowed us to refile the entire action in the 15 case, the Tapley case. Now to your point Judge, in the event that this court does determine that Jose and Pugh should have filed an appeal in the 12th case, the first case, Federal Appellate Rule 3 provides that you can file notice of appeal and that if there's an error in form but not in substance that that should rule the day. And so the notice of appeal that was filed in the 15 case explicitly referred to Jose and Pugh's claims that were sought to be appealed to this court. It explicitly referred to the orders. It said the history as to which claims were refiled and the district court specifically in the 15 case, the new case, referred to the fact that this was a refiled case and all parties understood that it was a refiled case when it was refiled. So it was the understanding of the part of plaintiff appellants consistent with rule 41, consistent with Federal Appellate Rule 3, as well as the Illinois Savings Statute that this was a notice of appeal that preserved Mr. Jose and Mr. Pugh's rights. Now even if the caption was Tapley versus Chambers at all, the language of the notice specifically informed all parties and this court what was to be appealed. Do we have the record? Is that what you're saying? Now that is another issue, Judge. That's a big issue. It is, it is. I acknowledge, of course, that it is and I did call the district court. I've spoken specifically to the clerk of the district court in the 12 case and the 12 case informed me specifically that the record was sent on the first notice of appeal, which was a 14 appeal that was filed. I looked, of course, at the record from that case and it was unclear whether the record was sent back. So they told me specifically that they didn't have the record. The record in the 12 case was unclear, frankly, as to what was sent back or if anything was sent back. But the clerk told me that it was already sent. So that, unfortunately, you do not have portions of the record. If we don't have that, we don't have jurisdiction. Well, Judge, and of course, we can, under federal appellate rule 10, we can require that and I can file a motion to try and preserve the record. I did attach parts of the record, the relevant parts of the record, to the appendix, which include the summary judgment rulings. But, Your Honors, you are correct. You do not have the depositions or the like. I mean, if we don't have jurisdiction, we don't have jurisdiction. Well, Judge, and again, I would go to rule 41 and whether the notice should have been filed, you know, in the 15 case or the 12 case. And the actual notice that was provided did meet the substance of federal appellate rule 3, if not informed in substance. But the record was attached, the relevant orders to be appealed were attached, as well as the relevant record. And both counsel referred to the record in their briefs. So as to the issue of Mr. Tapley's stop itself, and before I do that, I do want to go into the issue of pen and appellate jurisdiction, just as a save all, essentially. Now, there are two summary judgment orders, specifically in this case, that dealt with the same exact issues. In the 12 case, the first case, the district court indicated that Mr. Tapley, there was no probable cause to stop Mr. Tapley initially, and that he could proceed on his illegal seizure claim, and that his malicious prosecution claim was granted on summary judgment, as it believed that the officers could reasonably believe that there was probable cause. In the 15 case, the second case that was filed, the district court reversed itself, essentially, and said that there was no probable cause to, I'm sorry, there was probable cause to stop Mr. Tapley, and this was due to an issue of whether he was speeding. In the first decision, the issue was whether his music was loud, whether he was speeding, whether there was other reasons to stop his vehicle. So both summary judgment orders, both the 12 summary judgment order and the 15 summary judgment order, dealt with the exact same issues. And so, in order to determine the 15 summary judgment decision, this court will have to look at the inextricably intertwined decision from the 12th case, and which deal with the same exact issues, the same exact facts, and that would bring in Tapley's claim of malicious prosecution, and I believe it should also bring in the Jose and Pew claims. Now, as to Tapley's stop itself and the arrest of Mr. Tapley, the incident began when Mr. Tapley was driving, he drove to what's called a price right, a gas station essentially. He acknowledges he was playing his music during the stop. Officers, four officers from Bloomington were in the area, and they indicate that they were surveilling that location for possible narcotics or other loud music violations. Officer Stanfield was the individual, the officer who stopped Mr. Tapley, and Officer Stanfield acknowledged in his testimony that he specifically did not know how fast Mr. Tapley was going. But he knew how fast he was going. But he knew, now he was a couple blocks behind Mr. Tapley, so in order he had to catch up to Mr. Tapley, he didn't actually see Mr. Tapley until he caught up to him. And when he approached Mr. Tapley's vehicle, he said to him, I don't know how fast you were going. He did say he had to go to speed to catch up to him, but again, he didn't immediately follow him when Mr. Tapley left the price right. He decided to go after him after Mr. Tapley was several blocks away. So even if he had to speed to catch up to go several blocks away, that doesn't mean that he personally observed the speeding occur. And so Officer Stanfield approaches the vehicle, and what happens is the other officers come up to the vehicle. This is Officer Secora, Officer Chambers, and Officer Heinlein. And Officer Stanfield walks back to his vehicle, and Officer Chambers and Officer Tapley are on the driver's seat side and passenger side of the vehicle. So Chambers asks Mr. Tapley to leave the vehicle, and Mr. Tapley testified that he did not refuse, but just asked simply why he was being asked to exit the vehicle, as when he was stopped in the past, he had not been asked to exit. And then the response essentially was that there was a canine coming to the scene, and that's why they were asking him to exit. Mr. Tapley acknowledges he asked again, and then at that point Mr. Tapley said, you know, I'm willing to go, but again, why? And then that's when Officer Chambers told Officer Secora essentially get him, and Officer Secora opens up the passenger door to Mr. Tapley's vehicle, enters into the vehicle according to Mr. Tapley's testimony, puts a taser to his head, and that's when Tapley jumps out of the car. So Mr. Tapley's standing outside of the vehicle for roughly five to six minutes until Officer Stanfield again approaches and says that he's under arrest for obstruction. And we believe that the district court was an error because there is an issue of fact as to the probable cause for the actual stop of Mr. Tapley, and then specifically if we go back to the malicious prosecution claim, there was no probable cause to arrest Mr. Tapley for obstruction as he never took any physical actions to obstruct the officers in their actions and what they were doing that day. The testimony also shows that we can show malice in this case as the officers testified to a significantly different version of events than Mr. Tapley did, and put that version of events in the things that the officers testified to are that Mr. Tapley grabbed Mr. Chamber's arm, tried to pull his arm, which Mr. Tapley denies, and Officer Sikora says that he didn't see, and that Mr. Tapley said words such as fuck that, other physical actions. So we believe that the evidence will show that this is a genuine issue of material fact and that Mr. Tapley's claim should proceed to trial in the summary judgment ruling should be overturned. Now if this court is going to hear Mr. Tapley and Mr. Pugh's claims, I will speak briefly to the facts in that claim, and in that case what happens is Mr. Jose and Mr. Pugh are working for the city of Bloomington for the streets department, and in that situation they approach a high school friend of Mr. Jose's named Daryl Clark, and Mr. Clark is standing on the street. They drive by Mr. Clark. They briefly stop and essentially exchange telephone numbers, and then drive off. There's nothing suspicious according to both Mr. Jose and Mr. Pugh. They stopped for just a brief period of time. Mr. Clark did not approach the vehicle, and there was no reason to believe this was anything than a simple hi and bye. Little do Mr. Jose and Mr. Pugh know that Officer Stanfield and Officer Mayer are actually surveilling Mr. Clark that day, and so Officer Stanfield is in the area. He starts to travel behind the work truck that Mr. Jose is driving. Mr. Jose stops at a light, puts on the flashing lights to indicate that he's going to actually work. He gets out of the car with Mr. Pugh. They start filling a pothole, and then that's when Officer Stanfield approaches. When Officer Stanfield approaches, he's allowed, of course, to ask them questions in a consensual manner, which he does, and at that point Mr. Jose and Mr. Pugh just explained that it was a simple stop and they knew nothing about Mr. Clark, whether he was selling drugs or anything else, and so at that point Mr. Stanfield does a pat-down search, has them take off their boots, goes in their pockets, and then from there they search the vehicle and their personal belongings, and they're there for 25 to 45 minutes. So we believe that the District Court erred in its decision granting summary judgment, and as to the jurisdictional issue, that this appeal should be properly heard before the court. Good morning. Thank you, Your Honor, and may it please the Court. My name is Peter Appelees in this case, and first I will apologize for my coughing this morning. I'm trying to get over a bit of a cold. There are a number of issues to be addressed in this case. Obviously the first one is the question of appellate jurisdiction. And when was case one a final judgment that could be appealed? Case one became a final judgment either when Mr. Tampley refiled his case or when the plaintiff's one-year deadline for filing under 13-217 expired. That is the holding in the S.C. Vaughan case from the Illinois Supreme Court, which had a similar situation where a case was dismissed for wanted prosecution, and the Illinois Supreme Court held that although that was a dismissal without prejudice under 13-217, that became a final judgment when that one-year period to refile expired. So I think that judgment did become a final at that point, and even if it did not, the plaintiff did not refile any of the other claims. As they've indicated, they could have refiled those claims, but they did not do so, did not refile them in the 2015 claims case. Hosea and Pugh were never mentioned in the caption and the complaint on the court's docket. They were never treated as parties to that case and therefore cannot appeal and cannot use the doctrine of pen and appellate jurisdiction to bring those claims along into this case. They haven't cited any case in which pen and appellate jurisdiction was used to sweep up rulings from a prior case dealing with a separate incident. And so you disagree with counsel's thought that case two was a continuation of, is merely a case, a continuation of case one. The case law is very clear that a refiling is not a continuation. It is an entirely new case and it is treated as if the first case had never been filed other than the deadline for the refiling. What's your position on the fact there's no record? That is absolutely something that we have pointed out and relied upon. The 2012 case is not of record in this case, has not been made part of the record in the 2015 case, so the court has no record on which it could review the malicious prosecution claim that Mr. Tapley made or the claims made by Mr. Hosea and Mr. Pugh. And our disposition should be that what? Your disposition should be a ruling that they are not proper parties to the appeal and to the extent that they have sought to appeal they should be dismissed from this appeal. The court should proceed to a rule on Mr. Tapley's claim arising, his single claim arising from the September 15, 2011 case or incident. And moving forward on that particular incident in Mr. Tapley's unlawful seizure case, the Supreme Court's ruling in Devenpeck v. Alford made clear that as long as there's probable cause for any violation, even if it's not the one that the officer cites or charges, then there cannot be an unlawful seizure claim. And there were two bases for probable cause to stop Mr. Tapley. First that he was speeding and second that he had loud music. Plaintiff truncates Officer Stanfield's response to the question when he indicates that Officer Stanfield did not know how fast Mr. Tapley was going. He was asked if he knew how fast Tapley was going. He said no, but he was moving at a pretty good rate. I didn't think I could catch him. I heard his engine revving very high. The speed limit was 30 miles an hour. He was going well over the speed limit, 40 or 50 miles an hour. So if you look at his answer in total, it's very clear that he was very convinced that. He did use those words. Yes, well over the speed limit, I believe, was his exact words. And Mr. Tapley did not dispute that. He listed that as a disputed fact, but he did not cite any evidence or any testimony that would dispute the fact that he was speeding. Can you get to the search of Hosea and Pugh's pockets and boots? What reasonable, articulable suspicion did Stanfield have for that? I get the stop, I get the general search, but what about the pockets and boots? Sure. The police officers had been surveilling Darrell Clark. Officer Stanfield had made two previous arrests of Darrell Clark related to drug possession and drug sales. And so he and Officer Mayer were conducting a surveillance of the arrests took place. Officer Mayer reported that she saw a city truck from her surveillance position on a parking deck, that she saw a city truck pull up to this house, that she saw Mr. Clark come out and approach the city truck. And there's some dispute over what happened there. Plaintiff says that he came out, but Mr. Clark didn't walk all the way up to the truck. Officer Mayer indicated to Officer Stanfield that she saw him come all the way up to the truck and appeared to put his hands inside the truck. So Officer Stanfield said that he would try to locate the truck. And his initial thought was that he would just get the number on the truck and call the city garage and let them know. But the leaving Mr. Clark made a couple of turns and Officer Stanfield had a little trouble locating the truck initially. And finally came across it kind of going opposite directions. And the truck stopped at an intersection. Jose and Pew had not been filling potholes. They weren't, you know, one end of the street, you know, working their way down. They just pulled up at the end of the street. When they saw Officer Stanfield, or at least appeared to, when the two of them reached that point, they stopped, turned on their overhead lights, hopped out, and started filling a pothole in the brick street. Officer Stanfield looked at that. He didn't think there was really any hole that needed to be filling there. And it appeared odd to him that they seemed to kind of stop at a random point when he encountered them and appeared to try to fill this spot. So he initially made a consensual encounter with them and had some conversation with them about Mr. Clark and the goings on. Okay, so let's get to the boots. Okay. Yeah, that's all I ask. What, I mean, I know all the factors and everything led to that. Sure, but all of those lead up to the base doing that. And Officer Stanfield's testimony was that he requested consent from Hosea and Pugh, and that they consented to that search. Hosea and Pugh... Your Honor. Go ahead. Mr. Hosea and Mr. Pugh dispute that they gave a material and that the search was proper, regardless of their consent, based upon the suspicion that they had been involved in a drug transaction, that this was a brief, reasonable encounter. There was no indication that they might have had a gun or any kind of weapon, so it wasn't a safety check, right? Well, I mean, there is some indication, you know, that they'd been involved in a drug transaction, so whenever... But no guns had been seen or anything like that? No, there was no report of a gun or a weapon at that point in time. And if, you know, we go to the O'Connor versus Ortega case in the Supreme Court, you know, the court reminds us that the fundamental command of the Fourth Amendment is that the search be reasonable. And we're talking about city police officers dealing with some city employees, you know, on a brief, reasonable encounter to investigate the possibility of drug transactions using, or using city equipment or on city time, and so I think it was, you know, given that fundamental command of reasonableness within that command of reasonableness. So you think that takes it out of being a violation of a Terry frisk, the fact that it was a city truck? Because normally you can't. The search of the truck would, because... Right, I'm talking about the individuals. The search of the individuals is different. I think that's within the jurisdiction of the court to conduct a brief pat-down in that situation. And even if the court did not agree with that, I think the officers are entitled to qualified immunity because a reasonable officer could have believed that their actions under those circumstances were appropriate. Let's see. And just to touch briefly on the malicious prosecution claim, it's not before the court, and I don't think the court reaches that discussion, but it can't be the case, if the court did reach that, that every acquittal gives the acquitted defendant a triable case on malicious prosecution. The officers clearly had probable cause to charge Mr. Tapley with obstruction. He refused to get out of the car when he was asked to do so several times and did not get out until he was threatened with a taser. So clearly I think there was probable cause for obstruction. Moreover, the officers don't prosecute cases. Prosecutors prosecute cases, as this court and Supreme Court have noted. And there's also no evidence of malice. There is some case law that malice can be inferred from a lack of probable cause, but that's only a situation where there is really no other valid explanation. And I don't think that's the situation here in this case. The plaintiff hasn't pointed to any motive that the officers had to prosecute Tapley other than a legitimate law enforcement motive. I don't think this is the kind of case where malice can be inferred simply from a lack of probable cause. Unless the court has further questions, that's all I have. Thank you very much. Pleasure as always, Your Honor. I'll briefly speak to some of the issues counsel raised. As to when there was a final judgment in this case, there was no Rule 54 language in the first case judgment. So if counsel is correct that the appeal should have been filed within the one-year refiling deadline, the notice of appeal in this case was filed within that time period. So that would be timely filed. And so it's not our belief that it should have been filed within the 30 days of the first case judgment, as that was not a final appealable judgment. And going to the stop of Mr. Jose and Mr. Pugh, as this court has held in the Jones v. Clark case, the act of simply doing work in a public area as a public employee is not suspicious in and of itself. And so as counsel was stating that it was suspicious that Mr. Jose and Mr. Pugh actually stopped their vehicle to fill a pothole when they hadn't been filling potholes previously, that of course was part of their job because they worked for the Streets Department and so they were simply doing their job filling a pothole. And there is a dispute, you know, as to whether Mr. Jose and Mr. Pugh actually went up to Mr. Clark or Mr. Clark came to their vehicle. According to Mr. Jose and Mr. Pugh, there was no physical contact between the two of them, which would not give the defendants any reason to believe that there was a drug transaction taking place. And the information that the defendants did have about Mr. Clark that day was not that he was selling drugs, but simply that six months prior he had been arrested with marijuana in his possession. As to Mr. Tapley and the stop and arrest of Mr. Tapley, I will note that when Mr. Stanfield first approached Mr. Tapley, he acknowledged that he did say that there was no reason, he wasn't going to stop him for speeding, the only reason he was stopping him was for the loud music. And then in his deposition later on, that's when he gave a testimony as to, you know, I believe he was going fast, I couldn't say how fast, but maybe, you know, 40 to 50. So it's a matter of looking at the initial statement that was made at the scene versus later on in his deposition. But that being said, we would ask again that this Court look at all the claims and parties in this case and reverse the case. Thank you. Thank you. Thanks to both counsel. Case is taken under advisement. Court will proceed to the fourth case.